S. David GREENBERG and M. William Brod, Plaintiffs,

v.

The EQUITABLE LIFE ASSURANCE SOCIETY of the United States, Defendant,

and

Leonard M. Hansen and LaVerne C. Hansen, Additional Defendants.

Civ. A. 5522.

United States District Court
D. Minnesota,
Fourth Division.
Sept. 10, 1958.

Roger E. Joseph, of Maslon, Kaplan, Edelman, Joseph & Borman, Minneapolis, Minn., appeared in behalf of plaintiffs and defendants Leonard M. Hansen and LaVerne C. Hansen.

David W. Raudenbush, of Morgan, Raudenbush, Morgan, Oehler and Davis, Saint Paul, Minn., appeared in behalf of defendant The Equitable Life Assurance Society of the United States.

NORDBYE, Chief Judge.

This cause came before the Court for trial on a stipulation of facts.

On July 18, 1956, Greenberg and Brod filed suit against the Equitable Life Assurance Society of the United States (hereinafter called Equitable) to obtain the cash surrender value of two insurance policies. The policies were issued to LaVerne Hansen and Leonard Hansen in 1941. The Hansens were brothers. In 1944, the Hansens assigned the policies to Northwestern National Bank of Minneapolis (hereinafter called the Bank) as collateral security. On October 25, 1949, the Bank assigned all of its right, title and interest in and to the policies to plaintiffs Greenberg and Brod. All of the assignments were filed with defendant Equitable as required in the policies. At the same time that Equitable was notified of the assignments to plaintiffs (February 14, 1950), plaintiffs requested payment of the cash surrender value to them and surrendered the policies to Equitable.

Before Equitable had acceded to plaintiffs' demands, it received a letter from the Hansens' attorney, dated March 1, 1950, which stated:

"Information has come to us and our clients that assignees under a certain assignment of life insurance policy as collateral are attempting to prevail upon your company to release the cash surrender value of the above policies without the signature or the consent of Mr. LaVerne C. Hansen and Leonard M. Hansen.

"Your attention is called to the fact that these policies were put up as collateral and it is the contention of LaVerne C. Hansen and Leonard M. Hansen that the primary security has not been exhausted and that, therefore, assignees cannot, at least at the present time, require you or either of the Hansens to surrender the value of these policies.

"It is our understanding that the assignment in part provides as follows:

" 'This assignment is made and the policy is to be held as collateral security for any and all liabilities of the undersigned, or any of them, to the assignee  *  *  *.'

"Both Leonard M. Hansen and LaVerne C. Hansen have been requested by Mr. Greenberg and Mr. Brod to execute a 'Request for Cash Surrender Value of Policy' which they have each refused to do.

"So that there may be no misunderstanding between your company and Leonard M. Hansen and LaVerne C. Hansen it is their position that you should not surrender any of the funds which have accumulated and credit it to the above mentioned policies. If you do release these funds the Hansens will have only one alternative which would be an action against your company. We trust that this action will not have to be pursued."

On March 29, 1950, Equitable notified plaintiffs that

"We wish to advise that the insureds under these policies are asserting a claim superior to that of the assignee's. In this connection

Attorney Thorson has cited to us the case of Allis v. Ware [28 Minn. 166], 9 N.W. 666, in support of his contention that your clients could not obtain the advantage of the assignment of the policies which were given as security for a debt to another, which debt was satisfied.

"In view of the conflicting claims to the policies we shall be unable to consider the request for the surrender values of the policies which you submitted to us on February 14, 1950, until such time as the consent of these policyholders is secured. In the event that consents of these policyholders cannot be secured within a reasonable time, the Society will return the policies to you."

In the meantime both policies had lapsed on February 22, 1950. Although plaintiffs became owners of the policies through the assignments, they were not notified of the lapse until October 5, 1950. They made no attempt to pay any lapsed premiums thereafter. There was a provision in the original assignments to the Bank which stated:

"The undersigned agree to pay or cause to be paid the premiums upon said policy and to deliver to the Bank at least twenty (20) days prior to the date such policy might lapse for non-payment of premiums, receipts evidencing payment of such premiums. In the event of failure to so pay and deliver receipts, the bank may, but shall not be obligated to pay any such premiums and any amount so paid by the Bank shall become a part of the indebtedness hereby secured, shall be due upon demand and shall bear interest at the same rate as the principal of said indebtedness."

The Hansens did not attempt to elect any of the options available when the policies lapsed; in view of this fact and in view of the dispute between plaintiffs and the Hansens, Equitable automatically converted the net cash value of the policies into extended term coverage. Due to the cost of the extended term coverage, the cash surrender value of the policies was reduced from $5,066.77 when plaintiffs first demanded payment (February 14, 1950) to $4,504.52 when the Hansens, after this suit was brought, first joined in demand for surrender of the cash value on April 25, 1958. Plaintiffs demanded payment of the cash surrender value on March 6, 1950, and March 29, 1950, but were refused each time. The company informed them that in fairness to other policyholders it could not subject itself to possible double liability. Equitable suggested that the plaintiffs settle their differences with the Hansens and procure the Hansens' permission to withdraw the disputed fund. As mentioned, the Hansens did not join in demand for the cash surrender value until the Spring of 1958. This was eight years after plaintiffs first made their demand upon Equitable and almost two years after suit was commenced. After plaintiffs brought suit, Equitable joined the Hansen brothers in suit by a counterclaim for an action in interpleader. This brought all of the interested parties into court.

The primary question for consideration is whether or not Equitable should have paid the cash surrender value to plaintiffs on February 14, 1950.

With respect to assignments, the policies state:

"No assignment of this policy shall be binding upon the Society or be deemed to be in force as to the Society unless in writing and until filed at its Home Office. The Society assumes no responsibility for the validity of any assignment.

"The Insured may assign this policy and all rights hereunder. An assignment by the Insured shall exclude any and all rights of any other person referred to in this policy, but upon release of all outstanding assignments or upon reassignment to the Insured, the respective rights of the several persons referred to in this policy shall be the same as if such assignments had not been made, and if assigned or pledged as

collateral only by the Insured, any equity remaining at the death of the Insured prior to the maturity as an Endowment shall accrue to the beneficiary."

Notwithstanding the fact that the assignments here were made as collateral security, the assignees became the owners of the policies. Concededly, the assignments were valid and binding on their face. Furthermore, all of the policy conditions were met with respect to executing valid assignments.

There seems to be no question but that Equitable would have paid the cash surrender value to plaintiffs had no dispute developed between plaintiffs and the Hansens. Equitable contends, however, that its knowledge of the dispute legally precluded it from paying plaintiffs the cash surrender value until plaintiffs demonstrated that they were the proper recipients of the fund. Equitable also contends that if it paid the wrong party it would be subjected to a double liability. Its reasoning is based primarily upon dictum in the case of New York Life Ins. Co. v. Federal National Bank, 10 Cir., 1945, 151 F.2d 537, 162 A.L.R. 536, certiorari denied 327 U.S. 778, 66 S.Ct. 522, 90 L.Ed. 1006. That case involved a dispute between the beneficiary of a life insurance policy and the insurance company. The company paid the policy proceeds to an assignee. Thereafter it developed that the assignor had been mentally incompetent when the assignment was made. The court held that the beneficiary could not recover from the insurance company too unless the company knew that the assignor was insane, or was in possession of facts which put it on inquiry as to the assignor's mental condition. The court stated, inter alia, 151 F.2d at page 540,

"There is yet another reason why the Bank [acting as guardian of the beneficiary] may not prevail. That part of the policy which gave the insured the right to assign contains this provision: 'The company assumes no responsibility for the va-lidity of any assignment.' This provision was a part of the contract made at a time when the parties were competent to contract, and must be given effect. There is no ambiguity or uncertainty as to the meaning of this provision. It can only mean that the Company shall not become liable by virtue of the assignment which for any reason was invalid. There was good reason for the inclusion of such a provision. The Company had a large number of policy-holders. Many requests for the assignment of policies would be received. The Company no doubt realized that fraud, duress or undue influence might be practiced in many instances which would go to the validity of the assignment, or that assignments might be invalid for many other reasons, including impaired mental capacity or even lack of mental capacity to make the assignment. If the Company was to be charged with liability if an assignment was invalid for any of these reasons, it would of necessity be compelled to deny the right to assign, or in each instance would be compelled to carefully investigate the application before it was granted. This would place an impossible burden upon the Company. It was for these reasons that the Company in substance said to the insured: 'We will give you the right to assign, but we shall not be liable if for any reason the assignment is invalid.' This provision would not, of course, protect the Company in the case of an irregular assignment because that would put it upon notice, or in cases in which it had knowledge of the mental condition of the insured, *or in cases in which it had knowledge of facts which should put it upon inquiry*. But this is not such a case." (Italics supplied.)

The policies in the case at bar also contained "non-responsibility clauses" which stated that "The Society assumes

no responsibility for the validity of any assignment."

Dictum to the effect that an insurer with notice of some irregularity may be held twice liable appears in other cases, but these cases do not mention a "non-responsibility clause." See Mc-Nerney v. Aetna Life Ins. Co., 284 App. Div. 21, 130 N.Y.S.2d 152; Wodell v. John Hancock Mut. Life Ins. Co., 320 Mass. 1, 67 N.E.2d 469. While the cases have denied liability to *beneficiaries* or *those in the same position as an assignor*, here defendant Equitable seeks to deny liability to the *assignee* because the company was given notice of a dispute.

Perhaps the Court is not warranted in saying that the "non-responsibility clause" can be used only for the protection of an insurer from the insured. But it is difficult to see why such a clause can be asserted against assignees holding valid assignments. It would seem that the purpose of the provision would be to uphold the validity of assignments rather than to cloud their propriety. The assignment, among other things, stated:

"1. The following rights and privileges are included in this assignment and pass by virtue thereof:

"(a) The sole right to collect from the Insurance Company the net proceeds of the policy when it becomes a claim by death or maturity, and to collect any Disability Income, unless this right be waived by the Bank in writing.

"(b) The sole right to surrender the policy before maturity and to receive the surrender value thereof at any time that such surrender value is available.

\*    \*    \*    \*    \*    \*

"(e) The sole right to exercise all non-forfeiture options permitted by the terms of the policy and to receive all benefits and advantages derived therefrom. \*    \*    \*

\*    \*    \*    \*    \*    \*

"5. The Bank shall receive and apply on the indebtedness secured by this assignment all sums paid under said policy at any time without first resorting to other collateral, notwithstanding that the indebtedness may not then be payable, and any balance that may remain with the Bank after payment in full of such indebtedness shall be paid to the person or persons who would have been entitled to receive the same from the Insurance Company had this assignment not been executed. \*    \*    \*"

Apparently from Equitable's viewpoint when it received the letter from the Hansens' attorney, it had only two courses of action open. The policy had lapsed and no steps had been taken by the Hansens to elect any of the options available under the policies. Consequently, Equitable had to pay the cash surrender value to plaintiffs, or it had to continue the policies' coverage as extended term insurance. If the cash surrender value were paid into court pending the determination of ownership, the extended term coverage would cease. Then, if the Hansens' position were ultimately sustained, discontinuation of the term "insurance" would have violated the provisions of the policies. Admittedly, Equitable took a position which was favorable to it as well as to the Hansens by continuing coverage. No one questions that Equitable, faced with an apparent dilemma, may have acted in good faith. But obviously the continuation of the insurance benefited it. However, when an insurance company designs its own policy and grants to an insured the unqualified right to assign all interest in such policy, it must expect that situations may arise. which will be troublesome. No doubt under certain circumstances which put it upon inquiry, the prudent action for an insurance company to take may be to refuse to honor an assignment, and if not sued by the assignee, to proceed to court timely under an appropriate proceeding in order to have its rights and obligations

determined. That is one of the burdens it must assume when it grants its insured an unrestricted and unqualified right to assign the policy issued to him. But that does not mean, however, if eventually it is determined that the assignees were entitled to the proceeds of the policies on the date of the demand, that the insurance company is absolved from paying the amount rightfully due them under the assignment. The unqualified right of an assignee cannot be limited by the mere assertion of a claim by the assignor which is not ultimately substantiated. On the record here, this Court must conclude that the plaintiffs succeeded to all of the right and title to these policies held by the Bank on February 14, 1950. There is no showing that the plaintiffs had any transactions personally with the Hansens. Consequently, in so far as this record discloses, the Court must assume that the plaintiffs, by purchase or other considerations, stepped into the shoes of the Bank in so far as the Bank's rights in and to these policies are concerned. If we commence, therefore, with the premise, as we are unquestionably required to do, that these plaintiffs were the owners of the policies on February 14, 1950, it must necessarily follow that whatever Equitable did thereafter, it did at its own risk.

The primary purpose of the assignment privileges granted to the insured is to enable the latter to utilize that asset in business transactions as collateral or otherwise. If the unqualified right of a banking institution, for instance, to an assigned insurance policy for a loan could be thwarted by unsupported claims and contentions by an assignor as to the validity of the assignment, it must be apparent that no banking institution could assume to accept such an asset as collateral in a business transaction with the insured. Moreover, the belated capitulation of the Hansens in withdrawing any objections to the payment of the surrender value to the plaintiffs and agreeing that plaintiffs had the sole right to demand the cash surrender value

of the policies as of February 14, 1950, does not lend any support to the view that there may have been some substance to their claim when Equitable was notified that it should not honor the request of the plaintiffs for the cash surrender value. The stipulation of facts is devoid of any recital which would justify the Court in making any finding on that question. In absence thereof, the Court must assume on this record that there was no defense to the unqualified assignment which the insured had given to the Bank. The joint requests of the plaintiffs and the Hansens as of April 25, 1958, made to Equitable stating that plaintiffs were entitled to the cash surrender value as of February 14, 1950, is entirely consistent with provisions of the assignment which provide that the assignee could apply on the indebtedness secured by the assignment all the sums paid under said policy at any time without first resorting to other collateral, and which provided further that "any balance that may remain with the Bank after payment in full of such indebtedness shall be paid to the person or persons who would have been entitled to receive the same from the Insurance Company had this assignment not been executed." Moreover, Equitable was aware that this provision in the assignment was directly contrary to the alleged rights of the Hansens as asserted by Thorson, their attorney. In addition, the assignment executed by the Hansens contained this provision:

> "The sole receipt of the Bank for any amounts payable under said policy and received by it shall be a full discharge and release of the Insurance Company therefor and the Insurance Company shall not be bound in any way to see to the application of the proceeds of said policy by the Bank. * * * "

That this provision made Hansens' claim of doubtful validity seems evident. The burden of proof to justify the failure to honor this valid assignment rested on Equitable. This burden it has failed to sustain.

It is true that plaintiffs did not file a *formal* request for the cash surrender value within three months after the lapse in the payment of policy premiums. The policies state that "Within three months after default in the payment of any premium after two full years' premiums have been paid, the Insured may elect one of the following Options", which, in substance, are (1) receive the cash surrender value; (2) apply the net cash value towards purchase of a single premium endowment insurance; (3) apply the cash surrender value towards the purchase of single premium extended term insurance; and (4) remain silent and let Equitable exercise Option 3 in the Insured's behalf.

As stated, the policies lapsed February 22, 1950. The Hansens remained silent during the three months' period, and thereafter Equitable exercised the fourth option in their behalf. However, eight days prior to the lapse, these plaintiffs demanded the cash surrender value. Plaintiffs were not informed by Equitable of the lapse of the policies until October 5, 1950. Within three months thereafter, plaintiffs filed another demand for the cash surrender value. Moreover, Equitable communicated with plaintiffs on March 6, March 31, and April 11, 1950, without making any reference to the lapse of the policies. Plaintiffs having therefore made timely demand before the lapse for the cash surrender value, and repeatedly thereafter, cannot be held to the strict terms of the policies that require the insured formally to elect the options above noted within three months after default.

■ In addition, the Court has determined that it must allow interest from the date that the cash proceeds of these policies rightfully became due to the plaintiffs. The long delay in bringing this matter before the Court for determination is partly due to the illness of counsel for the plaintiffs. Then, again, it must be recognized that the defendant Insurance Company could have instituted timely and appropriate proceedings to bring the controversy before a court of competent jurisdiction. Certainly, it would seem that if an interpleader action was not available to Equitable because the Hansens had made no demand for the cash surrender value, nevertheless a proceeding under the Federal Declaratory Judgments Act, 28 U.S.C.A. § 2201 et seq., could have been instituted by Equitable and the rights of the parties determined as soon as it was apparent that a stalemate had been reached. In any event, it would seem to follow that, in view of the Court's findings that plaintiffs were entitled to the cash value of these policies as of February 14, 1950, interest must be allowed whether it is based upon the theory that it is compensation for the use of another's money, or that it is to be allowed by way of damages.

■ Equitable attempts to utilize the interpleader device by counterclaiming for attorney's fees on the basis of interpleader. Plaintiffs accept the proposition that the initiator of a strict interpleader action is entitled to attorney's fees for litigating a dispute. The propriety of such a rule is evident. Where the mere holder of a disputed fund has no interest in the fund, but is only interested in seeing that the proper party receives it, the expense of establishing the proper recipient obviously should not be born by the stakeholder. If however, the stakeholder has an interest in the subject matter of the dispute, the action is one only in the nature of interpleader and the stakeholder is not entitled to attorney's fees. Klaber v. Maryland Casualty Co., 8 Cir., 1934, 69 F.2d 934, 106 A.L.R. 617.

Equitable contends that it has no interest in the subject matter of the dispute. To support its position it relies on New York Life Ins. Co. v. Miller, 8 Cir., 1944, 139 F.2d 657. In that case, the beneficiary sued to recover the proceeds of a policy. New York Life paid the policy proceeds into the court and converted the action to one in interpleader, thereby joining two adverse claimants to a portion of the proceeds. The insurance company demanded attorney's

fees. In upholding the insurance company's claim, the court said, at page 658:

"We think that the appellant was entitled to an allowance for attorneys' fees out of the fund deposited in the registry of the court. The record discloses that the appellant was a disinterested stakeholder acting in good faith and on the advice of counsel, and that it had resisted payment of the appellee's claim only for the purpose of protecting itself against the claims of Maddox and Dillon, from whom the appellee had not been able to procure disclaimers. The Interpleader Act of 1936, 49 Stat. 1096, 28 U.S.C.A. § 41(26) (e), authorizes the procedure which the appellant adopted to protect itself against the danger of multiple liability and to convert the appellee's action upon the policy into a suit in interpleader. It is not conceivable to us that it makes any difference whether a distinterested stakeholder who is entitled to avail himself of the remedy of interpleader brings a separate suit and enjoins the claimants from bringing or proceeding with other actions, or whether he accomplishes exactly the same result by the means selected by the appellant in the instant case. If the appellant had brought an independent suit in interpleader, it would have been entitled to an allowance for attorneys' fees to be determined by the District Court and paid out of the fund in Court. Mutual Life Ins. Co. v. Bondurant, 6 Cir., 27 F.2d 464, 466; Hunter v. Federal Life Ins. Co., 8 Cir., 111 F.2d 551, 557. There is no reason to penalize the appellant because it accomplished the same result in a different, but entirely legitimate, way. The amount to be allowed the appellant by the District Court as an attorneys' fee should not exceed what would have been allowed had the suit been an independent suit in interpleader."

The present case does not fall within the situation covered in the Miller case. Although Equitable could have been a disinterested stakeholder in 1950, it assumed a position favorable to the Hansens and of benefit to itself. It therefore lost the position of a "disinterested stakeholder." It seems almost too obvious for comment that the amount of reduction in cash value between 1950 and the time of suit is of direct interest to Equitable. Cf. John Hancock Mutual Life Ins. Co. v. Yarrow, D.C.E.D. Pa.1951, 95 F.Supp. 185; Century Ins. Co. v. First National Bank, 5 Cir., 1939, 102 F.2d 726, certiorari denied 308 U.S. 570, 60 S.Ct. 84, 84 L.Ed. 478. But for this suit Equitable would have continued to exercise the same dominion over the fund as it has since 1950. Therefore, Equitable is not entitled to attorney's fees.

The above may be considered as the Court's findings of fact, and thereon the Court makes the following

### Conclusions of Law

1. That plaintiffs are entitled to the cash value of the policies in question as of February 14, 1950.

2. That plaintiffs are entitled to judgment against the defendant Equitable Life Assurance Society of the United States in the sum of $5,066.77, with interest thereon at six per cent from February 14, 1950, together with their costs and disbursements herein.

Let judgment be entered accordingly.

An exception is reserved.